IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PEDRO HERNANDEZ III; CARMEN
HERNANDEZ; ENRIQUE HERNANDEZ;
YESENIA RAMIREZ, and SELENA
HERNANDEZ, a Minor Child, by and through
her Parents and Next Friends, ENRIQUE
HERNANDEZ and YESENIA RAMIREZ,

        Plaintiffs,

vs.                        Case No. 05-1103-JTM

ROBERT CONDE; DEAN AKINGS;
ROD WEBER; BRIAN DOUGHERTY;
R. SCOTT HARPER; and CHRIS SMEE,

        Defendants.

## MEMORANDUM AND ORDER

      This matter comes before the court on the defendants' Motion for Summary Judgment (Dkt. No. 74). After reviewing the parties' arguments, the court grants defendants' motion for summary judgment and qualified immunity.

## I. STANDARD OF REVIEW

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary

judgment beyond a reasonable doubt.  <u>Baker v. Board of Regents</u>, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  <u>Dayton Hudson Corp. v. Macerich Real Estate Co.</u>, 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>.'"  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in <u>Matsushita</u>).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

## II. FINDINGS OF FACT

### A. The Hernandez Family

Pedro Hernandez came to the United States from Mexico in 1998.  Carmen Hernandez is married to Pedro. They have five adult children, including  Martha, Baudilio, Esteban, Ovidio and Enrique.

On May 15, 2003, Pedro and Carmen lived at 340 Heizer in Great Bend.  Enrique came to the United States from Mexico in 2000. He is an undocumented alien working under an assumed name.  On May 15, 2003, Enrique lived at 340 Heizer with his parents, his wife Yesenia, and their baby Selena.  Baudilio lives with his wife Manuela at 336 Heizer in Great Bend and has lived there for five years. 336 Heizer is located immediately next door to 340 Heizer.

Martha came to the United States from Mexico in 2002. Martha lives with her husband

2

Manuel Tavarez at 301 Fruit in Great Bend. Their home backs up to the alley behind 340

Heizer. Manuel Tavarez owns the properties at 316, 328 and 340 Heizer. Martha and Manuel's

son is Ivan Tavarez. Ivan Tavarez has lived with his parents at 340 Heizer in the past, as recently as

the year 2000. In 2000, Tavarez moved to 328 Heizer, where he lives with his girlfriend. 328

Heizer is within sight distance of 340 Heizer.

Tavarez has a .357 magnum pistol, an SKS rifle and an AK-47. Tavarez is Pedro and

Carmen Hernandez' grandson. He is Enrique and Yesenia's nephew.

Chief Dean Akings, Officer Scott Harper and Officer Rod Weber had been to the area in

September 2001, arresting Ivan Tavarez during an investigation for aggravated assault for placing a

handgun against the neck of Severo Ayala, threatening to kill him. Tavarez was arrested at 328

Heizer with an SKS assault rifle. He reported that he lived at 340 Heizer at that time.

The area around 340 Heizer in Great Bend is an area prone to violence and crime.

**B. KBI's Undercover Buy**

Terry Millard is a detective with the Great Bend Police Department and has been employed

in that capacity since 1996. Millard called the KBI on May 15, 2003, to alert them to the possibility

of using a woman by the name of Karen Byerly as a confidential informant in the Great Bend area.

Millard did not engage Byerly to act as a confidential informant for the Great Bend Police

Department. Instead, Millard brought Byerly to the KBI.

Robert Conde is a Special Agent with the KBI stationed in Great Bend. He has been so

employed since January 2002. Kelly Ralston is a Special Agent in Charge of the special operations

division of the KBI. He has been employed in that capacity since 1999.

On May 15, 2003, Ralston introduced Conde to Karen Byerly. Byerly said Conde could

purchase drugs from Travis Underwood. Byerly and Conde met Underwood later that evening to

buy drugs. Underwood got in the back seat of Conde's car and the three drove toward the southeast area of Great Bend.

Underwood directed Conde to drive to the parking lot of Peterson's Mechanical, a business at 705 Heizer.  Conde gave Underwood money to purchase drugs. Underwood left the car and walked to a nearby trailer home. He was gone for 10 minutes. Underwood returned with cocaine and gave it to Conde.

Conde spoke with his supervisor, Ralston, about the details of the undercover buy. Ralston told Conde to apply for a search warrant for the residence where the buy occurred.

## C. KBI's Facially Valid Search Warrant

Following the transaction, Conde signed a search warrant application and supporting affidavit for the search of a residence at 340 Heizer, Great Bend, Kansas, on May 15, 2003.

On May 15, 2003, at 10:45 p.m., the District Court of Barton County, Kansas, issued a facially valid search warrant for 340 Heizer Street, Great Bend, Kansas, for cocaine and other controlled substances and drug transaction related items.

## D. The Great Bend Special Services Team

Dean Akings is the Chief of Police in Great Bend, Kansas. He has held that position for 23 years.  Sometime around 1989 to 1990, Chief Akings came up with the idea to create a Great Bend SWAT team, called the Special Services Team (SST), to deal with dangerous search warrants, in particular the number of meth labs they were experiencing in Great Bend at the time. The decision as to whether to allow the SST to be used in order to perform a search warrant is the full province of Dean Akings and he is always consulted, if he is in town, prior to the use of the SST.

The SST was used primarily for execution of search warrants. The SST was also used in hostage situations.  Team leader Harper testified that the SST is used when there are concerns about

individuals within a residence subject to a search warrant, whether the concern is a large group of people within or that the layout of the residence to be searched is unknown.

Although the SST was originally intended only to execute dangerous search warrants, there are no specific factors or any written guidelines that are to be considered before authorizing the use of the SWAT team to execute a search warrant.  However, defendants note that Chief Akings testified to several factors he takes into consideration when making the decision, including whether the occupants might have weapons, have an arrest record or other contact with law enforcement, or whether they are connected to a drug cartel. Chief Akings also considers the officer safety and public safety factors.

Prior to May 2003, the SST has been used over fifty times.  Chief Akings authorizes the training procedures employed by the SST and is aware of the procedures and tactics employed by the SST as routine.  Chief Akings testified that most of the time the SST attempts to execute the search warrant at night, but not always.

Although SST members attempt to execute the search warrant at night, they wait the same amount of time before forcibly entering a residence, knocking and announcing and waiting approximately twenty seconds, during both nighttime and daytime search warrants.  The goal of the SST when executing a search warrant is to enter the residence as "unannounced as possible" in order to quicky subdue any individuals in the residence without allowing them time to react. Additionally, the SST members attempt to execute the search warrants during the night not only to allow them to be more concealed but also to allow a greater effectiveness for flash grenades. However, Chief Akings testified that the noise of the flash device is equally distracting during the day and during the night.  Finally, the SST attempts to execute the search warrants at night in hopes of entering the residence unannounced and catching the occupants of the residence to be searched

while they are still in bed, which is "the element of surprise."

When actually entering the residence, the SST follows the same procedure. They approach the residence in an attempt not to be discovered, knock on the door, the officer who knocked on the door counts to himself to twenty, the officer then knocks on the door and simultaneously announces "Police Search Warrant." If the officer hears nothing, the door is physically opened either by pry bar, batting ram or shotlock fired by a shotgun.

At times, the SST uses a flash device to distract the occupants of a structure to be searched. The flash device or flash grenade puts off a great deal of light, akin to shining a flashlight in someone's eyes, and makes a loud noise. The flash device or grenade "explodes," putting off a tremendous amount of "candle light," particularly when used at night. This device is extremely loud and results in temporarily deafening and disorienting the subjects of the search.     The SST is tasked with entering a residence, clearing the residence of occupants, placing the occupants in the custody of other law enforcement officers, and leaving the scene. Chief Akings testified that SST is not responsible for the arrest or other disposition of the occupants of the residence.

**E. Request from KBI**

Lt. David Bailey contacted Chief Akings and advised him that the KBI was requesting to use Great Bend's entry team to make the initial entry to execute the search warrant.

Chief Akings approved the request for KBI's use of the SST to make initial contact and clear 340 Heizer for execution of the search warrant.

Chief Akings was aware of no facts which would justify the use of an SST type entry to execute the search warrant.  Chief Akings authorized the use of the SST to execute the search warrant on 340 Heizer based on his belief that the KBI had requested the use of the SST.

For the purpose of the warrant execution, the SST consisted of Officers Brian Dougherty, Chris Smee, Rod Weber and team leader Scott Harper.  The SST is funded in part by federal grants based on Barton County's high level of meth lab activity.

**F. Briefing at the KBI Office**

Members of the SST reported to the KBI office in Great Bend where Ralston and other members of the KBI and a federal DEA agent provided briefing. The briefing occurred sometime between 10 and 10:30 p.m. No Great Bend officer spoke at the briefing.

Chief Akings attended the briefing.  Ralston of the KBI ran the briefing.  The KBI was in charge of the investigation of activities at 340 Heizer.

Ralston reviewed the location of the residence to be searched, the drug activity that occurred during the day, the fact that a drug buy was made at the residence, and that those inside the residence were potentially dangerous.

Keith Lumry is a Special Agent in the narcotics division of the KBI.  On May 15, 2003, Lumry was called in to assist with a KBI operation in Great Bend.  Lumry's role was to man the perimeter while the occupants of the house were removed and assist with searching the home.

Lumry attended the briefing. There was mention that there had been a double homicide at a local bakery, and there was a concern that the operation at 340 Heizer "might lead into that somehow."

The following additional information was provided at the briefing:

a. That a sale of cocaine had been made in the trailer for which the search warrant had been issued.

b. The name Hernandez was mentioned during the briefing.

c. Occupants of the trailer were suspected mid to high level drug dealers. There was mention that the search could lead to other search warrants in other areas.

d. It was unknown specifically whether weapons were available in the trailer.

e. There had been high traffic volume at the trailer.

f. There was no diagram of the inside of the home available and no information on how many people were inside.

**G. Officers' Recollection of Information Prior to Execution of Warrant**

Individual members of SST testified that they learned certain information at the briefing immediately prior to execution of the search warrant.

Officer Weber, a member of the SST, never saw the search warrant prior to executing the warrant on 340 Heizer and could not recall any particular danger or circumstance that justified or necessitated the use of the SST.  Weber said he had not been called to 340 Heizer nor had he been part of an investigation of 340 Heizer prior to May 15, 2003.

Officer Smee, a member of the SST, said the briefing revealed that this was a narcotics warrant involving mid to high level dealers, and a DEA agent was present, which was unusual. Officer Smee testified that he was not aware of criminal activity associated with 340 Heizer until the briefing on May 15, 2003.

Officer Dougherty testified that he did not see the search warrant before it was executed. There was no information regarding the number of occupants or the names of the occupants, whether any weapons would be expected to be found, the layout of the residence or any criminal background of any of the occupants of the residence, and the name of the alleged suspect. He also testified that the briefing revealed that this was a narcotics warrant involving mid to high level drug dealers, and this search would "possibly lead to other search warrants in other areas."

Officer Harper, the leader of SST, was asked what information suggested that execution of the warrant might be dangerous. He replied that it might be dangerous because little was known about how many people were inside, whether they had weapons or were under the influence, or the nature of the layout of the home. Harper also did not see or read the search warrant before executing the search warrant at 340 Heizer. He recalled that the Hernandez family name was identified during the briefing, as was the fact that the residence to be searched was involved with mid to high level drug dealers. Prior to May 15, 2003, he had no information that the occupants of 340 Heizer were involved in criminal activity.

Harper was aware of illegal activities of Ivan Tavarez, and he understood that Tavarez is related to the Hernandez family. Tavarez had reported that he lived at 340 Heizer. Plaintiffs note that Harper specifically testified that whether or not Ivan Tavares had previously been arrested was irrelevant to the execution of the search warrant on May 15, 2003, at 340 Heizer. However, Harper was unaware of where Tavares lived at that time, and did not in any way rely upon any information regarding Tavarez in formulating the plan to execute the search warrant on 340 Heizer.

Millard testified he was aware of other criminal activity in the area, including the possession of weapons and prior assaults by members of the Hernandez family.

Chief Akings testified that officers are aware of other factors that make the execution of a

search warrant after a narcotics sale inherently dangerous with an additional high risk for destruction of evidence by occupants of a residence.

Chief Akings testified that the use of the SST using a knock and announce entry is safer for officers and occupants to execute a drug warrant for a residence at which criminal activity has occurred because the occupants are more likely to be controlled before they can reach a weapon.

After the briefing, the members of the SST drove by 340 Heizer and devised the method of entry into the trailer. During a drive-by of 340 Heizer conducted by the members of the SST before formulation of their "plan" of entry, none of the SST members observed any unusual activity or traffic at 340 Heizer. However, team members also testified that the purpose of the drive-by was reconnaissance, not surveillance or detection of unusual activity. Due to the lack of information, the SST decided to use a flash grenade.

## H. Execution of the Search Warrant on 340 Heizer

At approximately 11:50 p.m. on May 15, 2003, the entry team approached the residence at 340 Heizer Street. As is their standard protocol, SST attempted to approach the residence without alerting the residents to their presence.

SST members then approached the door of 340 Heizer Street. Weber checked the door and ascertained that it was locked. Officer Weber then knocked on the door, then counted to twenty to himself silently, knocked a second time and announced "Police Search Warrant." After receiving no response, Officer Harper used a shot lock shell to disable the door lock. Officer Smee tossed a flash bang distraction device through the door. It hit the wall and rolled back to him. Officer Smee closed his eyes and turned his head as the device went off a few inches from his feet. Weber was also nearby when the flash bang went off. The four team members entered the trailer.

This was the first time that Officers Weber, Smee or Dougherty had ever used a flash

grenade while executing a search warrant. However, Harper, the team leader, testified that he had used the flash device before on at least three occasions.

**I. Officers Encounter Pedro Hernandez**

Officers Dougherty and Harper encountered Pedro Hernandez in the hallway and subdued him. At the time, Pedro was wearing a pocket knife, which was in a leather pouch attached to his belt. In the struggle, Harper shot Pedro, causing a flesh wound to Pedro's back. Dougherty handcuffed Pedro's hands behind his back and walked him outside.

Agent Butler, who did the scene investigation after the residence had been cleared, found Pedro's knife open and lying on the hallway floor near some bloodstains. However, plaintiffs controvert that the knife was in this location when Pedro Hernandez was originally shot. Plaintiffs also deny that Pedro Hernandez's knife was in any location other than in his pocket on his belt when Officer Harper shot him.

**J. Officers Encounter Enrique Hernandez**

On the evening of May 15, 2003, Enrique was awakened by a "big sound." He ran from the bedroom to the living room, where he heard a sound "like a thunder." He saw a light "like a fire," and two people entered the trailer. Enrique said two people shined a light on his face and tried to push him down. He resisted and fell to the floor. Officer Weber helped Officer Smee secure Enrique. Enrique was handcuffed with plastic zip cuffs and helped back up. He was escorted out of the trailer.

Officer Smee recalls the events as follows: Officer Smee encountered Enrique Hernandez in the living room. Enrique Hernandez looked stunned when the officer approached with his weapon drawn. Officer Smee approached Enrique and when he was in arm's reach of Enrique, the officer holstered his weapon and grabbed hold of Enrique. He repeatedly told Enrique to get down.

Because Enrique kept pulling back, Officer Smee forcibly took Enrique Hernandez to the ground. With the assistance of Officer Weber, Officer Smee got Enrique to the ground and handcuffed him.

Enrique was in the custody of Officers Smee and Weber.  The parties dispute whether this detention should be construed as an arrest.

Enrique waited outside, handcuffed, for 15 minutes and was taken away in a car by other officers.  Enrique understands a little English and knows what the word "police" means. He can identify the written word "police" in English.  Enrique claims he suffered a bruise and knee pain following his encounter with police.

Enrique did not seek medical treatment following his encounter with police. He did not take any medication, even aspirin, for any physical complaint following the encounter. He did not miss work because of any injury.  Enrique Hernandez claims he did suffer and continues to suffer ongoing pain with his shoulder and knees. He also alleges bruises across his chest as a result of the officers' actions.  However, there is no evidence Enrique's alleged knee problems stemmed from the execution of the search warrant, notably in light of the fact that Enrique works ten hours per day, six days per week at a meat packing plant placing 60 lb. boxes of animal skins onto a conveyor belt.

**K. Yesenia and Selena Hernandez Are Escorted from the Trailer**

Enrique's wife, Yesenia, was awakened by a sound like "thunder" and she states that she did not hear any knocking or announcement of police officers prior to being awakened.

Enrique and Yesenia's baby, Selena, awoke.  Selena was six months old at the time. Yesenia picked up Selena and followed Enrique from the bedroom.  Yesenia saw a white light.  The man – Officer Weber – brought her back to the bedroom and told her to get on her knees.  Yesenia continued to hold Selena.  The baby did not cry.  The officer did not touch Yesenia but prodded her with an object to move her back to the bedroom.  Yesenia was not touched or prodded by any officer

12

after that.  The officer did not touch Selena.

The officer asked Yesenia to go outside. While outside she objected to her mother-in-law, Carmen Hernandez, being forced down the stairs while handcuffed because Yesenia was aware of the fact that Carmen Hernandez could not walk on her own and asked the officers to bring a wheelchair.  The officers refused to do so, physically taking Carmen Hernandez down the stairs over Yesenia's objections.

Yesenia was not handcuffed at any time.  Yesenia, still holding Selena, was taken away by KBI agents.  Plaintiffs controvert the characterization of events and argue that KBI detained the two. Yesenia testified that none of the officers at the trailer were rude or mean to her.  Yesenia suffered no physical injuries from her encounter with police.  Yesenia knows what the word "police" means in English and Spanish.

Yesenia and Selena returned to Ivan Tavarez's home later that morning, as did Carmen and Enrique.  Yesenia Ramirez, Carmen Hernandez, Selena Hernandez and Enrique Hernandez were kept in custody until the next morning.

Selena has no memory of the incident and has never mentioned it.

## L. Carmen Hernandez Escorted from the Trailer

Officer Smee returned to the trailer after escorting Enrique Hernandez from the trailer to escort Carmen Hernandez from the trailer.

Carmen was in handcuffs from the bedroom to the porch. Then they removed the handcuffs. Plaintiffs note that the handcuffs were not removed until after Yesenia Ramirez objected to her mother-in-law being transported down the stairs in handcuffs as she was unable to walk on her own at that time.  Carmen admitted she was handcuffed for only a short time. Carmen was given shoes and a blanket before she was taken outside.

Carmen testified that she was not mistreated by any officer. No officer yelled at her or used bad language toward her or any of her family. Carmen was taken away by KBI agents. Carmen was originally escorted by Officer Smee. Plaintiffs characterize this as being taken into custody or detained.

Chief Akings did not participate in the execution of the search warrant.

SST then detained each of the occupants inside the residence and then turned them over to KBI agents and other officers.

## M. Search Finds and Station Visit

The search of 340 Heizer uncovered a large number of fake IDs and thousands of dollars in cash. The cash was Enrique Hernandez's savings from his job at the packing plant. There was no evidence of drug activity in 340 Heizer nor was any of the money that was used in the drug transaction, which had occurred less than six hours prior to the execution of the search warrant, found either in 340 Heizer or on any of the occupants or residents of 340 Heizer.

Yesenia Ramirez, Selena Hernandez, Carmen Hernandez, and Enrique Hernandez, were all transported to the KBI offices. Yesenia said she was at the police station until the next morning. She did not say she was questioned for six to eight hours. She testified that she was given milk and diapers to care for her baby, Selena. Carmen said only that she was at the police station for a "good time" and was questioned at one point, then reunited with Yesenia. Enrique testified only that he returned home from the police station at 6:00 a.m. He did not say he was questioned for six to eight hours.

While being detained at the KBI offices, Enrique Hernandez was questioned and photographed. When Enrique Hernandez, Carmen Hernandez, Yesenia Ramirez, and Selena Hernandez, returned to 340 Heizer at approximately 6:00 a.m., they were still not allowed to enter

14

into the residence because the search was not completed until 7:00 or 8:00 a.m. in the morning,
therefore, the family members went to Ivan Tavares' house to await 340 Heizer being released and
attempted to determine what had happened to Pedro Hernandez because at that time all they knew
was he had been shot and was bleeding.

## III. ANALYSIS

The parties raise several issues related to the approval and execution of the search warrant.
First, the parties dispute whether Chief Akings may be held liable for his actions related to the
approval of use of SST in execution of KBI's search warrant.  Next, the parties dispute whether
Officers Harper, Dougherty, Smee and Weber violated plaintiffs' clearly established constitutional
rights in the manner in which they executed the search warrant.  In particular, the parties dispute
whether defendants violated the knock and announce rule; whether the use of the flash grenade was
objectively reasonable; and whether defendants were arrested without probable cause.  Finally, the
parties dispute whether defendant Smee used objectively unreasonable force against Enrique
Hernandez.

Defendants also raise the issues of quasi-judicial immunity and whether certain plaintiffs
may advance independent claims for damages.  Plaintiffs claim that these issues have no application
to the case at hand.  As such, the court will not discuss these two claims.

## A. Qualified Immunity

Generally, the Eleventh Amendment shields from suit state officials acting in their official
capacity.  Wares v. VanBebber, 231 F. Supp. 2d 1120, 1124 (D. Kan. 2002).  In enacting 42 U.S.C.
§ 1983, Congress did not intend to abrogate state immunity.  Neal v. Lewis, 325 F. Supp. 2d 1231,
1235 (D. Kan. 2004).  Thus, when state officials act in their official capacities, they are entitled to
absolute immunity.  Id.  These officials are not considered "persons" within the meaning of 42

U.S.C. § 1983.  Id. citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The immunity is "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The Tenth Circuit places a presumption in favor of immunity for public officials acting in their individual capacities.  Hidahl v. Gilpin County DSS, 938 F. 2d 1150, 1155 (1991); Schalk v. Gallemore, 906 F.2d 491, 499 (10th Cir. 1990); Melton v. City of Oklahoma City, 879 F.2d 706, 728-29 (10th Cir. 1989), reh'g granted on other grounds, 888 F.2d 724 (1989).  The Supreme Court notes that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

To determine whether qualified immunity serves as a defense to a § 1983 action, the court undertakes a two-step analysis.  PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1207 (10th Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  First, the court must determine whether the facts alleged state the violation of a constitutional right.  Id.  And if so, the court must determine whether the constitutional right was clearly established at the time of injury.  Id.  If the answer to either of these questions is "no," then the defendant is entitled to qualified immunity.  Id.

In the context of the Fourth Amendment right to be free from unreasonable searches and seizures, the court analyzes whether a law enforcement officer's use of force in the course of making

16

an arrest may be considered objectively reasonable.  Graham v. Connor, 490 U.S. 385, 388 109,

S.Ct. 1865, 1867-68 (1989).  "To be constitutionally permissible, an officer's use of force must be

reasonable, which is measured 'from the perspective of a reasonable officer on the scene,'

recognizing that officers are sometimes 'forced to make split-second judgments' in uncertain and

dangerous circumstances.  Phillips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005) (citing Graham,

490 U.S. at 395, 396-97).  "What may later appear to be unnecessary when reviewed from the

comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to

the officer at the time."  Id. (citing Graham, 490 U.S. at 396).  The court balances "the nature and

quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake."  Graham, 490 U.S. at 396. The "reasonableness" analysis is not

mechanical but rather requires "careful attention to the facts and circumstances of each particular

case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  Graham, 490 U.S. at 396, 109 S.Ct. at 1872.  An objectively reasonable analysis

requires review of events in "light of the facts and circumstances confronting [officers], without

regard to their underlying intent or motivation."  Id. at 397.

## B. Chief Akings' Approval of the Search Warrant

Plaintiffs allege that Chief Akings violated their Fourth Amendment rights by approving the

use of the SST to execute the search warrant on their home at 340 Heizer, in Great Bend, Kansas, on

May 15, 2003.

Both parties cite Holland v. Harrington, 268 F.3d 1179 (10th Cir.  2001), as providing the

applicable standard.  In Holland, the court examined whether Fourth Amendment scrutiny extends to

the planning of an arrest, in particular the decision to employ a SWAT team to make an arrest.

17

Holland, 268 F.3d at 1191.  The Tenth Circuit found that it does and applied a Fourth Amendment

reasonableness test to the decision to deploy a SWAT team.  Id. at 1190.  The Circuit reviewed the

basis for deployment, including the dangerousness of the scene, the probability of the presence of

children, knowledge of plaintiff's violence, knowledge of other residents' violent tendencies, the lack

of clarity as to the number of adults at the residence, and the suspicion of firearms at the residence.

Id. at 1190-91.  After reviewing these factors, the Circuit held that the decision to deploy the SWAT

team was not by itself an excessive use of force.  Id. at 1191.  The Circuit held that there was no

violation of a constitutional right arising from the decision to deploy the SWAT team to execute the

warrants.  Holland, 268 F.3d at 1191.  The court found that plaintiff "failed to show that the

authorizing officers decided to use the SWAT team knowing that the SWAT team would use

excessive force, intending to cause harm to any person, or that they instructed the SWAT team to

use excessive force while conducting the April 16 raid."  Id.

        Since several factors will determine whether deployment of a SWAT team is reasonable, the

court evaluates these decisions on a case-by-case basis.  Here, Chief Akings relied on KBI's

assessment that SST was required.  Although the parties stipulated that Chief Akings approved

KBI's request, there is considerable disputes over the related facts.  Plaintiffs argue that Chief

Akings did not undertake any independent evaluation of the warrant or basis for using SST.  Since

the sole discretion as to authorize a SWAT team rests with Chief Akings, plaintiffs contend that he

cannot insulate himself.  Further, plaintiffs argue that KBI denied ever requesting SST, even though

Chief Akings acknowledges approving such a request.  Defendants respond that since Chief Akings

had been advised of KBI's request, this implied that a SWAT team entry was appropriate according

to KBI's assessment.  Even if KBI maintains it did not request a SWAT team, Chief Akings received

and approved such a request.

There is no evidence that Chief Akings saw or evaluated the warrant prior to approving it. Chief Akings relied exclusively on the request he received from KBI through another officer. He approved the request without further inquiry. However, plaintiffs' allegation that KBI did not request SST is not supported by the findings of fact. Plaintiffs stipulated that Chief Akings approved KBI's request for SST. At best, plaintiffs did not discern from whom the request originated. But this is not the same as saying there was no request. Furthermore, KBI took steps to inform particpating officers of the nature of the warrant by holding a briefing in its offices, indicating that they knew of local law enforcement participation. The information disclosed at this briefing could support the use of SST, as will be more fully discussed below. Chief Akings' approval of a request for SST for a facially valid warrant may be considered objectively reasonable. Officers may rely on the information provided by other officers or law enforcement bodies, such as KBI, and may rely on these parties' judgment. See, e.g., Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (arresting officers are entitled to rely on knowledge of other officers in making arrest); United States v. Shareef, 100 F.3d 1491, 1505-06 (10th Cir. 1996) (upholding as reasonable officer's reliance on dispatcher's mistaken report of a National Crime Information Center match to support arrest); United States v. Stratton, 453 F.2d 36, 38 (8th Cir. 1972) (concluding that arresting officers were entitled to assume that officers who requested aid had probable cause to make the arrest.

The parties dispute the various factors that allegedly support the use of SST. These factors include: 1) whether the search was in a high crime area; 2) Ivan Tavarez's prior contact with law enforcement; 3) whether the residents of 340 Heizer were "mid- to high-level" drug dealers; 4) whether the search was related to a recent double homicide; and 5) whether weapons may be in the residence.

Based on the KBI briefing, officers were aware that there had been a cocaine sale, the residents of 340 Heizer were allegedly mid- to high-level drug dealers and that the search was in a high crime area.  Although there was discussion of Ivan Tavarez's prior contact, there is no evidence that the officers were aware and evaluated this factor prior to the execution of the warrant. Therefore, the court does not include this contact as one of the factors.  Based on the findings of fact, the court notes that Officer Lumry mentioned there may have been connection to a double homicide. Finally, there was no information as to whether there were weapons at the residence, though there was mention that there was traffic to the house.  Based on these factors, use of SST was appropriate. A decision to use a SWAT team is evaluated not only on what information is available but also what information may not be fully ascertainable.  See Holland, 268 F.3d at 1190-91.

Accordingly, viewed in the light most favorable to plaintiffs, the court finds that Chief Akings' decision to approve the use of SST was objectively reasonable.  Based on a totality of circumstances, the factors revealed to officers at the KBI briefing support deployment of SST. The court finds Chief Akings is entitled to qualified immunity.

**C. Defendants' Execution of the Search Warrant**

Next, the parties dispute whether the manner in which the warrant was executed raises constitutional violations.

**1. Knock and Announce Rule**

Plaintiffs argue that defendants did not comport with the "knock and announce" requirement.  The legal dispute turns on whether Officer Weber should have announced after his first knock on the door and whether he waited an adequate amount of time before Officer Harper discharged the shot lock.

The "knock and announce" requirement has long been a part of the Fourth Amendment reasonableness inquiry.  Wilson v. Arkansas, 514 U.S. 927, 929, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (tracing the origin of the "knock and announce" requirement to 15th century precedent).  The rule is ". . . deeply rooted in our heritage and should not be given grudging application." Miller, 357 U.S. at 313, 78 S.Ct. 1190. The "knock and announce" rule requires officers to knock and announce their purpose and then wait a reasonable amount of time to allow the occupants the opportunity to comply with the law.  Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, n. 5, 137 L.Ed.2d 615 (1997); United States v. Jenkins, 175 F.3d 1208, 1213 (10th Cir. 1999). The purpose for the rule was explained as follows:

> In elaborating on these purposes, the Supreme Court has held that the privacy interests advanced by the rule include: (1) permitting individuals to comply with the law by peaceably permitting officers to enter their homes; (2) avoiding the unnecessary destruction of property that attends a forcible entry; and (3) providing an opportunity for occupants to "prepare themselves" for entry by law enforcement, for example, "pull[ing] on clothes or get[ting] out of bed."

United States v. Gallegos, 314 F.3d 456, 459 (10th Cir. 2002) (citing Richards, 520 U.S. at 393). However, "[t]his is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." Wilson, 514 U.S. at 934.  United States v. Myers, 106 F.3d 936, 940 (10th Cir. 1997) (finding that agents complied with the knock and announce rule when they knocked loudly on Mr. Myers's front door, and waited ten seconds before battering it down). An unannounced entry may be justified where police officers have reason to believe that evidence would be destroyed if advance notice were given.  Wilson, 514 U.S. at 936.

After knocking and announcing their purpose, law enforcement must receive actual, or constructive, refusal before entering.  <u>Richards</u>, 520 U.S. at 393; <u>Gallegos</u>, 314 F.3d at 459; <u>United States v. Jenkins</u>, 175 F.3d 1208, 1213 (10th Cir. 1999).  The home occupant need not affirmatively refuse admittance to trigger the right of the police to enter by force. <u>United States v. Knapp,</u> 1 F.3d 1026, 1030 (10th Cir. 1993).  Rather, the refusal may be "constructive" or "reasonably inferred" from the circumstances.  <u>Id.</u> (quoting <u>United States v. Bonner</u>, 874 F.2d 822, 824 (D.C. Cir. 1989)). Where the occupants do not admit the officers within a reasonable period of time, constructive refusal occurs, giving police the right to enter by force.  <u>United States v. Moore</u>, 91 F.3d 96, 98 (10th Cir. 1996) (citing <u>Knapp</u>, 1 F.3d at 1031).  The amount of time the officers must wait to infer refusal depends on the particular facts and circumstances of each case.  <u>Jenkins</u>, 314 F.3d at 1213.

The Tenth Circuit has held that under certain circumstances waiting approximately ten seconds is reasonable.  <u>Jenkins</u>, 175 F.3d at 1213.  <u>See, e.g.</u>, <u>Myers</u>, 106 F.3d at 940 (upholding district court's conclusion that agents who knocked loudly and waited ten seconds before entering complied with the Fourth Amendment); <u>Knapp</u>, 1 F.3d at 1031(affirming district court's determination that officers did not violate section 3109 because they waited ten to twelve seconds after knocking and announcing).  At the same time, the court has held three seconds to be an unreasonably short waiting period.  <u>See</u> <u>Moore</u>, 91 F.3d at 98 (affirming trial court's conclusion that entering three seconds after making announcement was "virtually instantaneous" and therefore "precluded any claim that the officers were precluded admittance" (internal quotation marks and citation omitted)).  However, the <u>Jenkins</u> court rejected a bright-line rule for determining how much time is appropriate. 175 F.3d at 1213.

22

The findings of fact indicate that Officer Weber knocked, counted to twenty, knocked again and announced police. After the first knock, there was no announcement. After the second knock, there was an announcement, but no evidence as to how long defendants waited before entering. The court is told only that "after receiving no response" Officer Harper used the shot lock. It appears that Officer Weber complied with the knock and announce rule to the extent his second knock included an announcement of police presence. However, there is no evidence as to how long he waited after this second knock. Defendants appear to be arguing that the twenty seconds after the first knock and the brief, though undisclosed, wait after the second knock should be sufficient to satisfy the knock and announce rule.

Based on the Tenth Circuit's holding in <u>Myers</u>, where officers waited ten seconds after a knock and provided no evidence of an announcement, the court finds that the officers' twenty second delay was reasonable. Practically speaking, plaintiffs would not necessarily be given adequate time to respond and given almost no notice that police were at the door. However, the short wait is justified based on the information officers knew at the time of the entry. Since this was the execution of a drug warrant, officers could reasonably believe that evidence may be destroyed if they delayed. The court declines to enforce a rigid rule of announcement where countervailing interests counsel otherwise.

## 2. Flash Grenade

Plaintiffs' next question is whether the use of the flash bang device was reasonable.

Although there is limited case law on flash grenades or flash bang devices, the Tenth Circuit has previously reviewed its use. The Tenth Circuit has noted that the "use of a flashbang device is neither per se objectively reasonable nor unreasonable." <u>Kirk v. Watkins</u>, No. 98-7052, 1999 WL

381119, at *3 (10th Cir. June 11, 1999); <u>Myers</u>, 106 F.3d at 940.  The reasonableness of its use

depends on the facts and circumstances of each case.  <u>Myers</u>, 106 F.3d at 940 (citing <u>Graham</u>, 490

U.S. at 397).  While noting that the use of flashbang device in a house with innocent and

unsuspecting children gave the court "great pause," the court also recognized the need to take into

account the reasonableness of an agent's action and consideration for safety.  <u>Id</u>.

In <u>Myers</u>, while the court noted that use of flash grenades should not be a "routine matter,"

the court found their use objectively reasonable.  The court noted that the factual findings indicated:

1) that Mr. Myers had a history of illegal drug trafficking; 2) that he had spent time in federal prison

for a fire bombing incident, although they were unsuccessful in learning of the details of the

incident; and 3) that there was a fair probability that Mr. Myers' residence contained an illegal

marijuana growing operation.

Similarly, in <u>United States v. Kingsley</u>, No. 97-40095-01-RDR, 1998 WL 295577 (D. Kan.

May 21, 1998), the court found use of a flash grenade reasonable where:  1) officers knew that

individuals who frequented the defendant's residence carried firearms; 2) officers knew about a

recent incident at the residence where an armed individual fled upon the arrival of police officers; 3)

officers noticed night vision goggles at a previous encounter at the residence; and 4) officers had

general knowledge that firearms are frequently found at places where methamphetamine is sold.

Here, the facts indicate that flash grenades are not routinely used by SST.  Besides training,

three officers had not previously used the device while team leader Harper had used the device a few

times before.  The SST members determined it appropriate to use the flash grenade after the briefing.

This decision turned in part on the facts revealed at the briefing, including: 1) the sale of narcotics

earlier in the day allegedly at the residence; 2) information that the occupants were mid- to high-

level drug dealers; 3) the lack of information as to whether weapons were available in the trailer; 4)

24

the traffic observed at the trailer; and 5) the lack of information about the layout of the home or the number of residents.  Additionally, officers were aware that weapons may be present in places where drug transactions occurred.  Based on the findings of fact and the information the officers were aware of, the court finds that the use of flash grenades was reasonable.  Officers attempted to reduce risk to themselves and the residents by using the device.  Although the lack of information by itself would not justify the use of a flash grenade, the sale of drugs that day, the belief that the drug dealers were mid- to high-level, and the lack of information as to weapons provided a basis for officers to seek ways to execute the warrant safely and effectively.

**3. Drawing Weapons and Detaining Certain Plaintiffs**

Plaintiffs additionally raise the issue of whether it was reasonable for officers to enter with weapons drawn and to use handcuffs to detain certain plaintiffs.

Officers may detain a person without probable cause while executing a search warrant if justified by the circumstances.  Florida v. Royer, 460 U.S. 491, 504, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).  However, such a detention must be "carefully tailored" to the law enforcement interests used to justify it.  Id.  "[T]here is nothing inherently unreasonable about an officer conducting a protective sweep with his or her weapon drawn.  Nor is it unreasonable to expect the officer to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat."  Anderson v. United States, 107 F. Supp.2d 191, 199 (E.D.N.Y. 2000).  Further, officers may apply handcuffs to those who are present during a search if they have "good reason to fear violence or destruction of evidence."  Torres v. United States, 200 F.3d 179, 186 (3d Cir. 1999).  See also Thompson v. City of Lawrence, 58 F.3d 1511, 1516 (10th Cir. 1995) (holding that it was not unreasonable for police officers to carry weapons into a home and handcuff

a suspect who had "a reputation for possessing firearms"); <u>Wright v. City of St. Francis, Kansas</u>, 2004 WL 838181 (10th Cir. 2004) (officers "showed some restraint" by holstering weapons after suspects were handcuffed).

"In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant." <u>Summers</u>, 452 U.S. at 702. While the <u>Summers</u> court found no special danger to police in that case, it also noted that execution of warrant to search for narcotics "is a kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation." <u>Id.</u> at 702-703. Cf. 2 W. LaFave, <u>Search and Seizure</u> § 4.9, pp. 150-151 (1978). The Court found that detentions further three law enforcement interests: 1) preventing flight of the individual if incriminating evidence is found; 2) minimizing the risk of harm to the police; and 3) facilitating orderly completion of the search. <u>Id.</u> at 702-03; <u>United States v. Ritchie</u>, 35 F.3d 1477, 1482 (10th Cir. 1994). Thus, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." <u>Summers</u>, 452 U.S. at 705. "Police may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection." <u>United States v. Bennett</u>, 329 F.3d 769, 774 (10th Cir. 2003).

Given the information known and not known to officers before the execution of the warrant as identified in the prior section, the court finds officers' entry with weapons drawn was reasonable. Officers holstered their weapons after the occupants were subdued. Officers handcuffed Enrique,

who was perceived as resisting arrest when he did not comply with officer orders.  Officers also

handcuffed Pedro, who they perceived as resisting arrest.  Carmen was initially handcuffed, but the

handcuffs were removed when she reached the porch. Yesenia and baby Selena were not handcuffed.

The court finds no constitutional violations relating to these plaintiffs.

Plaintiffs argue that no exceptions under Summers apply that would justify an arrest without

probable cause.  This court disagrees.  By detaining the occupants, officers prevented flight and

could minimize risk to themselves.  Although plaintiffs returned from the police station before the

completion of the search, plaintiffs were not allowed to enter the house until the search was

completed.  The occupants' assistance was not required to open locked doors and cabinets as

outlined in Summers, but the removal of occupants helped minimize risk to all parties.  In a trailer,

where there may not be adequate space to detain all residents within the structure, officers may

reasonably move occupants to facilitate the search and minimize problems.

**D. Officer Smee's Encounter with Enrique Hernandez**

Finally, the parties dispute whether Officer Smee violated Enrique Hernandez's Fourth

Amendment right to be free from unreasonable force.

To determine the reasonableness of police force, the court turns to the standard outlined in

Graham v. Connor, which is outlined more fully above.  Reasonableness should be measured from

the perspective of a reasonable officer on the scene.  Phillips, 422 F.3d at 1080.  The court

evaluates:  1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to

the safety of the officers or others; and 3) whether he is actively resisting arrest or attempting to

evade arrest by flight.  Graham, 490 U.S. at 396, 109 S.Ct. at 1872.  An objectively reasonable

analysis requires review of events in "light of the facts and circumstances confronting [officers],

without regard to their underlying intent or motivation." Id. at 397.

At the time of the entry, officers were aware that there had been a sale of cocaine allegedly at the trailer. Officers were also aware that there may be mid- to high-level drug dealers at the trailer. There was no evidence of weapons, though officers were aware that weapons are typically found with drugs.

Upon encountering Enrique, Officer Smee was aware that Enrique looked stunned and failed to follow the officer's repeated instruction to get down. Because Enrique was nonresponsive, the officer began approaching Enrique with his weapon drawn. At arm's length away from Enrique, the officer holstered his weapon and then grabbed Enrique. The officer continued to tell Enrique to get down. Since Enrique was not responsive and resisted going to the ground, the officer pushed Enrique to the ground with the assistance of another officer. Finally, the officer forced Enrique to get down and handcuffed him.

In the encounter Enrique failed to follow the officer's instructions, and he resisted being pushed to the ground and handcuffed. Based on the officer's knowledge of the scene and Enrique's failure to follow instructions, the force used by the officer was reasonable. Because Enrique did not have a weapon, the officer approached Enrique. When Enrique was within reach, Officer Smee put down his weapon and attempted to physically get Enrique to the ground. Officer Smee's use of force was reasonable under the circumstances. He used a weapon only to approach the nonresponsive occupant and put the weapon away when he was in reach. The court finds no evidence that Officer Smee's encounter with Enrique used unreasonable force.

Having found the defendants' actions reasonable, the court grants qualified immunity.

IT IS ACCORDINGLY ORDERED this 24th day of July 2006, that the court grants

defendants' motion for summary judgment (Dkt. No. 78).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE